AGUSTÍN HERNÁNDEZ MENA, demandante y apelante, *v.* BERNARDO LECUMBERRI, demandado y apelado.

No. 4039.—*Visto:* Enero 13, 1927. *Resuelto:* Marzo 11, 1927.

1. HIPOTECAS—TRASPASO DE BIENES HIPOTECADOS—DERECHOS DEL COMPRADOR—FINCA ADQUIRIDA DE UN TERCER POSEEDOR—EN GENERAL.—Adquirida una finca hipotecada de un *tercer poseedor,* el comprador adquiere con ella cualquier derecho, título o interés que su vendedor tenga en la propiedad vendida, subrogándose en los derechos de dicho tercer poseedor.

2. HIPOTECAS—TRASPASO DE BIENES HIPOTECADOS—DERECHOS DEL COMPRADOR—FINCA ADQUIRIDA DE UN TERCER POSEEDOR—MEJORAS—CONSTRUCCIONES' DE EDIFICIOS DONDE ANTES NO LOS HABÍA.—Comprada una finca hipotecada de un tercer poseedor, el hecho de que éste, en la escritura de venta, se refiera a ciertas construcciones en la finca como de *nueva construcción* no da al comprador derecho alguno sobre las mismas cuando, además de no excluir tal manifestación la hipótesis de que el que constituyó la hipoteca y no el tercer poseedor construyera aquéllas antes de la venta de aquél a éste, las construcciones en cuestión no equivalen a ''la construcción de edificios donde antes no los hubiere'' ni se demuestra que, siéndolas, fueron construídas por dicho tercer poseedor.

3. HIPOTECAS—INTERPRETACIÓN Y ''OPERATION''—BIENES HIPOTECADOS E INTERÉS DE PARTES EN LOS MISMOS—EXTENSIÓN DE LA HIPOTECA—MEJORAS—CONSTRUCCIÓN DE EDIFICIOS DONDE ANTES NO LOS HABÍA.—Un gallinero y un garage corriente en el patio de una residencia sub-urbana no son *edificios* dentro del significado del inciso 2, artículo 111, de la Ley Hipotecaria.

4. HIPOTECAS—INTERPRETACIÓN Y "OPERATION"—BIENES HIPOTECADOS E INTE-
RÉS DE PARTES EN LOS MISMOS—EXTENSIÓN DE LA HIPOTECA—MEJORAS—
CONSTRUCCIÓN DE EDIFICIOS DONDE ANTES NO LOS HABÍA.—Una casa de ma-
deras en el patio de una residencia sub-urbana que por su tamaño, proximi-
dad y situación respecto a dicha residencia tiende a demostrar que es una
casita para lavandera o para alojamiento del servicio, de las que general-
mente se encuentran contiguas a dichas residencias, en ausencia total de algo
que indique que originalmente iba a ser dedicada para un uso independiente,
no es un edificio dentro del significado del inciso 2, artículo 111 de la Ley
Hipotecaria.

SENTENCIA de *Miguel A. Muñoz,* J. (San Juan), declarando sin lu-
gar la demanda, sin costas. *Confirmada.*

*Salvador Mestre,* abogado del apelante; *Monserrat & Monserrat,* abo-
gados del apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del
tribunal.

En agosto de 1922, Domingo Rullán vendió a Ruperto
Fuentes una casa y solar en Santurce por $8,000, de los cua-
les el vendedor admitió haber recibido $5,000 del comprador,
reteniendo Fuentes los $3,000 restantes con el fin de satisfa-
cer una obligación pendiente de pago, garantizada con una
hipoteca por esta última cantidad, más los intereses sobre la
misma al 10 por ciento anual y una suma adicional de $280
por concepto de costas y honorarios de abogado. Esta hi-
poteca había sido otorgada en 1921 a favor de Jesús Sán-
chez González, quien en enero de 1923 instituyó un procedi-
miento sumario de ejecución para recobrar las cantidades
anteriormente mencionadas, $120 por concepto de intereses
adeudados hasta diciembre de 1922, más los intereses al tipo
indicado, desde dicha fecha hasta su completo pago, y por
la suma adicional de $13.89 como reembolso de la prima pa-
gada por el demandante sobre una póliza de seguro contra
incendio. Para esta época, la propiedad también estaba su-
jeta a los gravámenes de hipotecas posteriores y de embar-
gos trabados por otros acreedores de Fuentes, ascendiendo
en total a la suma de $4,991, todos los cuales constaban ins-
critos en el registro de la propiedad.

El 17 y el 18 de enero se notificó el requerimiento de pago

a Fuentes y a los acreedores hipotecarios posteriores, ninguno de los cuales compareció en dicho procedimiento.

En 26 de febrero el demandante solicitó, y al día siguiente obtuvo sentencia ordenando el embargo y la venta de las propiedades hipotecadas.

El 13 de marzo, Agustín Hernández Mena radicó una moción, de acuerdo con las disposiciones de los artículos 129 de la Ley Hipotecaria y el 175 del Reglamento, alegando el traspaso hecho por Rullán a Fuentes y un traspaso posterior de las propiedades hipotecadas hecho por Fuentes a Hernández en enero 22, 1923, y solicitando que el nombre de Hernández fuese sustituído por el de Fuentes en el procedimiento ejecutivo hipotecario. En la moción se hizo mención y se acompañó a la misma una copia de la escritura a que se ha hecho referencia últimamente, pero no hubo indicación alguna de que el traspaso incluyese otra cosa que la casa y el solar, a pesar de que dicha moción contenía una descripción amplia de la casa y el solar, como que eran las propiedades vendidas por Rullán a Fuentes, por Fuentes a Hernández, y como que eran idénticas a las descritas en la solicitud sobre ejecución de hipoteca. No era de esperarse que esta descripción detallada de la propiedad vendida por Fuentes a Hernández, siendo una copia *verbatim* de la que aparece en la hipoteca, llamara la atención de la corte o del abogado del acreedor a acontecimientos futuros que sólo proyectaban su sombra ligeramente, si acaso, por otros extremos contenidos en la escritura, o que se hacían conspicuos solamente con motivo de su ausencia en lo que a la moción misma se refería.

En el presente caso, Hernández, de ser un comprador de buena fe, parece haber pasado por alto una excelente oportunidad para levantar o para exigir que se resolvieran las cuestiones que habrán de discutirse más adelante.

En marzo 16, la moción de Hernández fué declarada con lugar, su nombre fué sustituído por el de Fuentes en el pro-

cedimiento ejecutivo hipotecario, y se ordenó al márshal que notificara tal sustitución.

No aparece que Hernández fuera un postor, no obstante haber estado presente en la venta en pública subasta, mientras se tramitaba la cual ocurrió el siguiente coloquio, preguntando el márshal: "Don Agustín, ¿qué va a hacer?" Y Hernández contestó: "Yo estoy pendiente si sobra algo."

Bernardo Lecumberri obtuvo la buena pro, obteniendo la propiedad vendida por el márshal por $3,600, pero al hacerse una investigación, se descubrió que Fuentes estaba en posesión de la propiedad. Entonces Lecumberri instituyó un procedimiento de desahucio contra Fuentes.

Una vez más se anotó la rebeldía de Fuentes, y Hernández solicitó de nuevo permiso para intervenir en el caso, por las siguientes razones:

"Primero:—Que por escritura pública No. 3, otorgada en 22 de enero de 1923, ante el notario de esta ciudad, don Manuel Tous Soto, el exponente hubo por venta que le hizo Ruperto Fuentes y Fuentes, demandado en esta acción de desahucio, la finca urbana que se describe como sigue: (a)—Urbana, o solar con una casa en la Sección Norte del barrio de Santurce de esta ciudad; la casa es terrera, construída de cemento armado y techada de ladrillos; el solar se compone de 14 metros, 74 centímetros, por el oeste, frente a la calle de la Iglesia; 36 metros 72 centímetros, por el norte, izquierda, lindando con solar y casa de don Eduardo Fenlong; 35 metros 43 centímetros, por el este, espalda, lindando con solar de don Julián Matienzo y por el sud, derecha, en 20 metros 80 centímetros frente del martillo, linda con solar de don Pedro Orcasitas, en 22 metros y 2 centímetros, recodo del martillo, linda con otro de don Francisco Furnis; y en 13 metros y 70 centímetros, al oeste, con el mismo Furnis.—(b)—Una casa de madera para vivienda, con su balcón, techada de hierro galvanizado, de siete varas de frente por cuatro varas de fondo, poco más o menos, colindando por el frente, sud, este y oeste, con el solar en que está enclavada.—(c)—Un garage para guardar dos trucks grandes, con armazón de madera, y forrado y cubierto con planchas de zinc, con un frente de seis varas de frente, por siete varas de fondo, poco más o menos.—(d)—Un gallinero para guardar aves de corral, fabricado con cuartones de madera

y forrado y cubierto con tela metálica.—SEGUNDO:—Que los inmuebles antes descritos bajo las letras (b), (c) y (d), están enclavados en el solar descrito bajo la letra (a),—en que lo está, asimismo, la casa construída de cemento que se describe, de que dice ser dueño el demandante Bernardo Lecumberri.—TERCERO:—Alega el peticionario que el·título de compraventa de lòs inmuebles descritos en el hecho primero de esta moción fué y está inscrito en el Registro de la Propiedad, en esta fecha, en cuanto a los inmuebles descritos bajo las letras (a), (b) y (c), al folio 50 del tomo 76 de Santurce Norte, finca No. 2335, cuadruplicado, inscripción 14.—CUARTO:—Alega el peticionario que, en la actualidad es dueño absoluto del dominio de los bienes inmuebles que se describen bajo las letras (b), (c) y (d) del hecho primero de esta moción; y que por tan poderoso motivo, tiene interés en la acción de desahucio en este asunto y desea ser parte uniéndose al demandado Ruperto Fuentes.''

La casa y solar descritos bajo la letra (a) son las propiedades descritas en la hipoteca, en el procedimiento ejecutivo y en la acción de desahucio. Ni Hernández ni Fuentes comparecieron en la vista preliminar de este último procedimiento, y en vista de la prueba aducida por el demandante Lecumberri, se dictó sentencia de acuerdo con la súplica de la demanda.

Al llegar Lecumberri acompañado por el márshal con un auto de posesión, Fuentes no fué encontrado en la propiedad, pero se obtuvo la llave de la casa de concreto que tenía un vendedor ambulante, quien había sido echado de la casa que Hernández describió como de madera en su moción solicitando permiso para intervenir como demandado en el procedimiento de desahucio.

Hernández apela de una sentencia adversa en un pleito de reivindicación, y alega que:

''La corte erró al declarar sin lugar la demanda expresando que el derecho del demandante se limitaba a solicitar el importe del valor de la propiedad a que se refiere, a solicitar que del precio de la enajenación de la finca en la subasta se le entregara a él el montante del valor de las propiedades que radican en dicho solar en el caso de que se entendiera que éstas eran accesiones al terreno te-

niendo en cuenta su naturaleza y uso en relación con la finca principal.

"La corte erró al considerar que convenía tener en cuenta si el demandante puede alegar que es un tercer poseedor haciendo aplicable a este extremo el caso de *Valdecilla* vs. *Auffant,* 1 D.P.R. 302.

"Cometió error la corte al declarar que el demandante no se encuentra dentro de las disposiciones del artículo 112 porque las nuevas obras no fueron costeadas por él."

En la súplica de la demanda no se solicitaba la restauración de la posesión de parte de la propiedad reclamada por Hernández, ni autorización judicial para un proyectado traslado de la propiedad por el demandante, ni para la venta judicial de la misma y la entrega del producto de tal venta al demandante. En resumen, se pedía que se declarase que el demandante era el deuño de las fincas ya descritas bajo las letras (*b*), (*c*) y (*d*) en la moción solicitando permiso para intervenir, *supra,* y en su consecuencia, que se obligara al demandado Lecumberri a pagar al demandante la cantidad de $1,500 por concepto de perjuicios, más las costas y honorarios de abogado.

Los artículos 110 al 113, inclusive, de la Ley Hipotecaria y el artículo 162 del Reglamento para su ejecución dicen así:

"Artículo 110. La hipoteca se extiende a las accesiones naturales, a las mejoras, a los frutos pendientes y rentas no percibidas al vencer la obligación, y al importe de las indemnizaciones concedidas o debidas al propietario por los aseguradores de los bienes hipotecados o en virtud de expropiación por causa de utilidad pública.

"Artículo 111. Conforme a lo dispuesto en el artículo anterior, se entenderán hipotecados juntamente con la finca, aunque no se mencionen en el contrato, siempre que correspondan al propietario:

"1. Los objetos muebles colocados permanentemente en un edificio, bien para su adorno o comodidad, o bien para el servicio de alguna industria, aunque su colocación se haya verificado después de constituída la hipoteca.

"2. Las mejoras que consistan en nuevas plantaciones, obras de riego o desagüe, obras de reparación, seguridad, transformación, comodidad, adorno o elevación de los edificios, y cualesquiera otras semejantes que no consistan en agregación de terrenos, excepto por

accesión natural, o en nueva construcción de edificios donde antes no los hubiere.

"3. Los frutos que al tiempo en que deba hacerse efectiva la obligación hipotecaria, estuvieren pendientes de los árboles o plantas, o ya cogidos, pero no levantados ni almacenados.

"4. Las rentas vencidas y no pagadas, cualquiera que sea la causa de no haberse hecho efectivas, y las que se hayan de pagar hasta que el acreedor sea satisfecho de todo su crédito.

"5. Las indemnizaciones concedidas o debidas al propietario de los inmuebles hipotecados, bien por la aseguración de éstos o de los frutos, siempre que haya tenido lugar el siniestro después de constituída la hipoteca, o bien por la expropiación de terrenos por causa de utilidad pública.

"Artículo 112.   Cuando la finca hipotecada pasare a manos de un tercer poseedor, no será extensiva la hipoteca a los muebles colocados permanentemente en los edificios, ni a las mejoras que no consistan en obras de reparación, seguridad o transformación, siempre que unas u otras se hayan costeado por el nuevo dueño, ni a los frutos pendientes y rentas vencidas que sean de la pertenencia del mismo.

"Si alguna porción de terreno de una finca gravada con hipotecas anteriores pasare a manos de un tercer poseedor, haciéndose constar en el Registro que no contiene máquina, mueble, objeto o construcción de ninguna especie, dicha porción de terreno seguirá afecta a las hipotecas anteriores de la finca; pero el tercer poseedor podrá retirar siempre que le convenga toda máquina, objeto, mueble o construcción que haya llevado o hecho, según los casos, prohibiéndose reclamaciones judiciales sobre tales agregaciones, y no siendo lícito, cuando se embargue o subaste por otros acreedores anteriores inscritos la finca y su porción vendida, pedir la retención de las repetidas agregaciones de cualquier especie que sean.   La inscripción de la venta se notificará a los acreedores hipotecarios anteriores.

"Artículo 113.   El dueño de las accesiones o mejoras que no se entiendan hipotecadas, según lo dispuesto en el párrafo primero del artículo anterior, podrá exigir su importe o retener los objetos en que consistan, si esto pudiere hacerse sin menoscabo del valor del resto de la finca; mas en el primer caso no podrá detener el cumplimiento de la obligación principal bajo el pretexto de hacer efectivo su derecho, sino que habrá de cobrar lo que le corresponda con el precio de la misma finca cuando se enajene para pagar el crédito."

"Artículo 162.   (Del Reglamento). El dueño de las accesiones y

mejoras que no se entiendan hipotecadas, según el párrafo primero del artículo 112 de la ley, y que opte por cobrar su importe, según el artículo 113 en caso de enajenarse la finca, será pagado de todo lo que corresponda con el precio de la misma, aunque la cantidad restante no alcance para cubrir el crédito hipotecario. Mas si las accesiones o mejoras pudieren separarse sin menoscabo de la finca, y el dueño hubiere optado, sin embargo, por no llevárselas, se enajenarán con separación del predio, y su precio tan sólo quedará a disposición del referido dueño."

El abogado del apelado cita *Morell, Legislación Hipotecaria,* tomo 3, página 711, como sigue:

"Si, pues, las mejoras a que tiene derecho el tercer poseedor pueden separarse sin menoscabo de la finca, puede retenerlas en su poder, o ha de conformarse con que se vendan separadamente, cobrando sólo su importe. Si sufre menoscabo la finca por la separación de las mejoras, han de enajenarse con ella, y del precio obtenido se paga íntegramente el valor de esas mejoras, y el resto nada más, aunque no alcance, se aplica al pago del crédito. Para que esta disposición de los artículos 113 de la ley y 187 del reglamento (igual al 162 de Puerto Rico) resulte menos injusta, entendemos que las mejoras debieran apreciarse con separación de la finca y entregarse al poseedor, no lo que costaron, sino lo que actualmente valieran o importasen. La ley, en su generalidad, no se opone a esta solución, sólo da derecho al poseedor a exigir el importe de las mejoras, esto es, lo que valgan, y el reglamento dice solamente que se le abonará lo que le corresponda. Los jueces acordarán lo que estimen más justo, sin perjuicio de que la finca se venda con las mejoras que lleve consigo, formando todo una unidad, pues la valoración de dichas mejoras sólo debe tener por objeto, entregar después su importe al dueño o tercer poseedor."

A esta cita sigue un extracto del Derecho Hipotecario y Notarial, por Barrachina, tomo 3, página 11, que dice así:

"El dueño de las accesiones o mejoras, a base siempre de que sea tercero, que no se entiendan hipotecadas, podrá exigir su importe o retener los objetos en que consistan. Esto último sólo cabe hacerlo si no sufriere menoscabo el valor de la finca.

"De manera que el *jus retentionis* reza con los muebles colocados permanentemente en los edificios y con las mejoras que consistan en obras de reparación, seguridad o transformación. Respecto de los

muebles que accidentalmente se hallen en el predio o los que permanentemente no formen parte del edificio, como por ejemplo, unas persianas, ese tercero tiene algo más que el *jus retentionis:* el derecho de retirarla, puesto que a tales cosas no alcanza la hipoteca en su extensión. Pues bien; tratándose de esas accesiones o mejoras que no se entienden hipotecadas, la Ley concede al tercer poseedor dos derechos; uno, exigir su importe; otro, retener los objetos en que consistan, si con esa retención no sufre menoscabo el valor de la finca, lo cual significa, aunque huelga decirlo, que si tal menoscabo existe, no hay tal derecho de retención, cabiéndole únicamente al tercero pedir el importe de los objetos; pero esto último, y dado el carácter de la acción hipotecaria que no puede detenerse, no autoriza a ese tercero para impedir el cumplimiento de la obligación principal asegurada, bajo el pretexto de hacer efectivo su derecho; el procedimiento judicial, ya ordinario, ya sumario, ha de seguir sus trámites, y cuando se llegue al momento de repartir la cantidad obtenida, es cuando cobrará la cantidad que le corresponda con el precio alcanzado por la finca, al mismo tiempo que se pague el crédito.

"De donde resulta que la Ley ha tenido presente: de una parte, el respeto al derecho del acreedor hipotecario, para que su ejercicio no sea atravesado por ninguna reclamación que haga el tercer poseedor para reintegrarse de las accesiones o mejoras, que aunque hechas en la finca, no se extiende a ellas la hipoteca; de otra, hacer compatibles, dentro de lo justo y de lo equitativo, los intereses de ambos interesados.

"¿Quién cobrará primero? ¿El tercero o el acreedor? A esto contesta el artículo 97 del Reglamento que, aunque dado para la Ley de 1869, puede aplicarse a la presente por no haber discrepancia en el punto a resolver que: 'Si las accesiones o mejoras son de las que no pueden separarse, ese tercero será pagado de todo lo que le corresponda con el precio de la finca, aunque la cantidad restante no alcance para cubrir el crédito hipotecario.' "

Galindo y Escosura, en su tomo 3, página 232, hacen un resumen de la misma ley, en la siguiente forma:

"Si los objetos en que consistan las accesiones o mejoras, pueden separarse sin menoscabo de la finca, tiene el tercer poseedor opción para llevárselos o para dejarlos. En este caso, se enajenarán con separación de la finca, y se le entregará el precio en que se vendan (art. 96 Regl.); disponiendo de ellos según tenga por conveniente,

caso de no venderse. Si no pudieran separarse sin menoscabo de la finca, carece el tercer poseedor de opción, y sólo tiene el derecho de cobrar su importe, del precio por que se venda el inmueble hipotecado, sin que pueda detener el cumplimiento de la obligación principal. (Art. 113 de la Ley.)''

[1] Estamos muy de acuerdo con el apelante en que cualquier derecho, título o interés que Fuentes tuviera en la propiedad ahora en controversia pasó a la persona que la compró, y que desde la fecha del tal traspaso, Hernández se subrogó en los derechos de Fuentes. Pero no estamos de acuerdo en que las construcciones en cuestión equivalían a ''la construcción de edificios donde antes no los hubiere,'' o que se haya demostrado que fueron construídos por Fuentes.

[2] Es cierto que una cláusula de la escritura otorgada por Fuentes se refiere a la llamada casa de madera, al garage y al gallinero como de nueva construcción. Pero tal manifestación no excluye la hipótesis de que Rullán construyera antes de transferir a Fuentes con unos cinco meses de anterioridad a la compra hecha por Hernández. En lo que se refiere a la ''casa de madera,'' la teoría del apelante queda prácticamente destruída por la declaración de un carpintero que examinó las ''casas'' en cuestión, las tasó y manifestó como testigo del demandante que la ''casa'' mostraba señales de ser vieja y de estar deteriorada, al tiempo de hacerse tal inspección.

El demandante parece haberse conformado con hacer descansar la cuestión de la construcción sobre la cláusula contenida en la escritura, tal vez fundándose en la teoría de que hay cosas que es preferible no moverlas. Tan sólo en la repregunta Hernández por primera vez hizo la manifestación conservadora de que la persona que le había vendido le había asegurado, y así lo había hecho constar en la escritura, que las casas en cuestión habían sido construídas después de haberse otorgado la hipoteca. Y es sólo bajo

la presión de nuevas repreguntas que este testigo manifiesta por información que dice haber tenido de Fuentes, que los "edificios" fueron construídos por Fuentes.

Evidentemente, el demandado no podría quejarse si la corte inferior hubiera admitido estas declaraciones de referencia como tendentes a establecer el hecho de la construcción efectuada por Fuentes. Pero el juez sentenciador no estaba obligado a creer las manifestaciones imputadasle a Fuentes por Hernández, o que tales manifestaciones, de haber sido hechas por Fuentes, fueran ciertas. Por tanto, la corte sentenciadora no cometió error al dejar de llegar a la conclusión de que las mejoras o "edificios," según sea el caso, fueron hechas por Fuentes, o al pasar por alto la prueba sobre este extremo y resolver sencillamente, como lo hizo, que el trabajo en cuestión no fué hecho por Hernández.

[3, 4] La naturaleza del gallinero y del garage como meras mejoras o anexos difícilmente da lugar a dudas. El gallinero estaba repleto de aves pertenecientes a Fuentes al tiempo de venderse el mismo, con su contenido, a Hernández. El garage fué usado por Fuentes mientras éste residía en la casa de concreto como dueño de la misma, y, fuera de la curiosa sugestión contenida en la escritura de traspaso a Hernández, no hay absolutamente nada que indique ningún otro uso en momento alguno. Un gallinero en el patio de una residencia suburbana difícilmente podría convertirse en un "edificio," dentro del significado del inciso 2 del artículo 111, *supra,* por el mero hecho de describírsele en la escritura de venta como que se intentaba usar, por ejemplo, para albergar avestruces. Tampoco podemos concebir cómo el referirse de igual modo a un garage corriente, situado en condiciones similares, designándosele como que iba a ser utilizado para guardar "dos trucks grandes," pueda ser otra cosa que una exageración.

La cuestión de la casa de madera es algo más dudosa.

Hubo alguna prueba tendente a demostrar que durante varios meses anteriores y posteriores al traspaso a Hernández, este "edificio" había sido ocupado por un vendedor ambulante de hortalizas. Este inquilino hizo una división en la casa, la cual constaba anteriormente de una sola habitación, puso allí un fogón de carbón vegetal y una letrina. No hay prueba alguna de a qué se dedicaba esta casa de una sola habitación antes de ser ocupada por el vendedor de hortalizas. No obstante, el tamaño de la casa, su proximidad a la casa de concreto, su situación en la parte posterior de una casa mayor, y la ausencia total de algo que indique que originalmente iba a ser dedicada para un uso independiente, tienden más o menos a demostrar que era una casita para una lavandera o para servir de alojamiento a los criados, de las que generalmente se encuentran contiguas a las residencias urbanas de Santurce.

La única ocupación del apelante, además de la de propietario, se refiere a *cuestiones de abogado.* En el presente caso pagó $3,500 en efectivo en presencia del notario por los bienes inmuebles comprados a Fuentes. De esta suma pagó $500 por la propiedad que ahora está en controversia y la cantidad de $300 que representa el precio pagado por la casa y el solar. El apelante hizo esto a sabiendas, teniendo entero conocimiento de las hipotecas inscritas, y de otros gravámenes más que pesaban sobre la propiedad que adquirió, y que aproximadamente ascendían a $8,000, es decir, la cantidad total del precio envuelto en la venta anterior hecha a Fuentes. Entonces Hernández permitió que esta misma propiedad o, por lo menos, la casa y el solar, fuera vendida en pública subasta por la suma de $3,600, libre de gravámenes, al aquí demandado, Lecumberri.

De suerte que a veces la escueta verdad parece ser "más rara que una novela." El punto de vista más benévolo que puede tenerse de la situación resultante, es que Her-

nández, citando las palabras del autor de "Poor Richard's Almanac," "parece haber pagado demasiado por su pito."

De haberse cometido el error envuelto en la referencia hecha incidentalmente por el juez sentenciador, y ocurrídasele posteriormente, al caso de *Valdecilla* v. *Auffant,* el mismo no fué perjudicial.

*La sentencia apelada debe ser confirmada.*